# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**The Scotts Company LLC,** *et al.*,

        **Plaintiffs,**

-v-

                                    **Case No.: 2:06-cv-488**
                                    **JUDGE SMITH**
                                    **Magistrate Judge Abel**

**Farnam Companies, Inc.,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs The Scotts Company LLC, Scotts Miracle-Gro Products, Inc., and OMS Investments, Inc.'s Motion for Partial Summary Judgment (Doc. 41) and Defendant Farnam Companies, Inc.'s Motion for Partial Summary Judgment (Doc. 44). For the reasons that follow, the Court **GRANTS in part and DENIES in part** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Defendant's Motion for Partial Summary Judgment.

## I. BACKGROUND

Plaintiffs The Scotts Company, LLC, Scotts Miracle-Gro Products, Inc., and OMS Investments, Inc. (collectively "Scotts") is a market leader in the lawn and garden industry selling and manufacturing products such as Miracle-Gro, Ortho, and Turf Builder. Defendant Farnam Companies, Inc. ("Farnam") is primarily an animal health care company, with an emphasis on equine health care, that also used to have a lawn and garden division, which was known as its Security Products division.

In the summer of 1998, Scotts and Farnam entered into negotiations concerning the potential sale of Scotts' business lines. Specifically, Farnam was interested in the possible purchase of Scotts' Finale business.[1] Scotts had entered into an agreement with RoundUp's owner Monsanto for the marketing rights for RoundUp and a share of RoundUp profits. As a result of this transaction and a Federal Trade Commission consent decree, Scotts decided it needed to divest itself of the Finale business. Mr. Richard Pontz, Farnam's President of its Security Products lawn and garden division, was the lead negotiator on behalf of Farnam. Mr. Pontz reported to Farman's CEO and owner Charles Duff regarding the negotiation of the Asset Purchase Agreement ("APA") with Scotts and regarding the budget and operation of Farman's lawn and garden division. Farnam's general counsel, Barry Harrison, was also involved in the negotiation of the APA on behalf of Farnam. David Aronowitz, Tony Colatrella, Christiane Schmenk, and Peter Supron negotiated on Scotts' behalf.

During these negotiations and due diligence, Farnam recognized that its small lawn and garden business could not expect to market Finale as had been done previously by AgrEvo and Scotts. Farnam shared its sales expectations with Scotts, that it believed that Finale would end up as a $3 to $4 million product. In an effort to further the negotiations for the sale of the Finale business, Scotts included a warranty that the business would achieve certain performance benchmarks and included what was, in effect, a liquidated damage figure equal to a proposed decrease in the purchase price if the benchmarks were not obtained. As a result, Scotts and

---

[1] Scotts acquired the Finale business from AgrEvo in the Spring of 1998. The Finale business consisted of the Finale line of non-selective herbicide ("NSH") products and the Vikor and Intercept brands of insecticide products. Finale was a weed killer and small competitor to RoundUp, the leading NSH brand in the industry.

Farnam reached an agreement on the warranty provision and the purchase price. On February 15, 1999, Scotts and Farnam entered into an APA for the sale of the Finale business to Farnam.

**A.    Section 2.03 of the APA ("The Purchase Price Provision")**

The purchase price provision of the APA, § 2.03, sets forth the timing and conditions in which Farnam will pay Scotts. This provision obligated Farnam to make the following payments:

1.    $1,573,852 at closing;

2.    $234,339 (representing 50% of the value of the excess Finale inventory) on or before May 15, 1999, subject to a right to set-off Farnam's direct costs associated with managing/reworking such inventory);

3.    $234,339 (representing the other 50% of the value of excess Finale inventory) on or before August 15, 1999, subject to a right to set-off Farnam's direct costs associated with managing/reworking such inventory);

4.    $48,449 (representing 100% of the value of excess raw material) on or before November 15, 2000, subject to a right to a set-off for the value of remaining raw materials still in Farnam's possession and not being used;

5.    $600,000 on or before October 31, 2001;

6.    $600,000 on or before September 30, 2002;

7.    $850,000 on or before September 30, 2003;

8.    $850,000 on or before September 30, 2004;

9.    $850,000 on or before September 30, 2005; and

10.    $100,000 on or before September 30th of each year thereafter through 2018, provided that such payments shall cease if and when Farnam or any of its affiliates are no longer manufacturing, marketing, distributing or selling GA products or products utilizing the Finale trademark or any derivative thereof.

(APA at p. 12).

Additionally, the payment obligations set forth in the aforementioned sections 6 through 9

are to be reduced by $100,000 if Farnam (and its successors or affiliates) did not manufacture, market, distribute or sell GA products or products utilizing the Finale trademark or any derivative thereof during the 12 months prior to the date such payment is due.

After closing, Farnam took a number of set offs in 1999 and 2000 against its future purchase price obligations under §§ 2.03(2), (3), and (4).  In October 2001, Farnam also took the position that it was entitled to a $3.25 million set off pursuant to § 3.15 of the APA.  Farnam used this $3.25 million set off to reduce their future purchase price payments under §§ 2.03(5)-(10).

In a December 11, 2001 email from Farnam's legal department manager, Pam Root, she explained that even if Farnam receives the full benefit of the $3.25 million set off due to an alleged breach by Scotts of the Asset Purchase Agreement, "the next payment due to Scotts would be $500,000 on September 30, 2005."  (Root Dep. Ex. 4).  Rather than making the $500,000 payment, Farnam only paid Scotts $400,000.

Farnam took the position that it had ceased selling, marketing, manufacturing, or distributing GA products as of September 30, 2004 and therefore, it did not owe the additional $100,000.  However, Scotts asserts that Farnam was involved in the selling, marketing, manufacturing and distribution of GA products after September 30, 2004.  Farnam registered Finale products in one or more states.  Further, Farnam entered into a master distributor arrangement with Shirlo for the distribution of Finale products and Shirlo continued to sell, market, manufacture and distribute GA products for two years after the September 30, 2004 timeframe.  (Watkins Dep. Ex. 5; Watkins Dep. At 37-39).

**B.** **Section 3.15 of the APA**

In § 3.15 of the APA, Scotts guaranteed that Farnam would achieve certain sales levels on

the business lines it acquired from Scotts for the 12 months ending September 30, 2000 (the "2000 season") and for the 12 months ending September 30, 2001 (the "2001 season"). The sales level warranty was $4,952,448 for the 2000 season and $5,101,021 for the 2001 season. In the event these sales levels were not achieved by Farnam, Farnam was entitled to a claim against Scotts for $3,250,000. On October 18, 2001, Farnam informed Scotts that it did not hit these sales levels for either the 2000 season or the 2001 season. Farnam sold about $2,176,000 of products associated with the Finale business for the 2000 season and $2,500,000 for the 2001 season. It was at this same time that Farnam informed Scotts that it elected to take the $3.25 million set-off. Scotts did not contest Farnam's claim of breach and did not challenge any of the offsets taken by Farnam.

By 2002, Farnam found the Finale business to be a failure, and by mid-2002, transferred the rights to distribute and sell Finale to a third party, Shirlo, Inc., which continued to market Finale through September 30, 2004. During the time Shirlo was responsible for Finale marketing, it sold less than $2,150,000 in Finale products. In 2004, Shirlo gave notice to Farnam that it was terminating its arrangement to distribute and sell Finale products effective September 30, 2004. After that date, Farnam did not sell any Finale products or products which used the active ingredients contained therein.

**C.    Section 7.10 of the APA ("Take or Pay Provision")**

Section § 7.10 of the APA, entitled "AGREVO SUPPLY AGREEMENT" contains the "take or pay" provision, which states:

> In the event that PURCHASER fails to purchase at least fifty thousand (50,000) pounds of GA (the "GA MINIMUM PURCHASE") by September 30, 2001, PURCHASER shall be obligated to pay SELLER an amount equal to 50% of the

dollar value of the GA MINIMUM PURCHASE less the dollar value of the GA
actually purchased . . . .

This provision is entitled "AgrEvo Supply Agreement" because it was intended to shift, from
Scotts to Farnam, a portion of Scotts' "take or pay" obligation to AgrEvo pursuant to the
AgrEvo Supply Agreement. In the AgrEvo Supply Agreement, Scotts was obligated to purchase
315,000 pounds of GA from AgrEvo at $40 a pound on a 100% active ingredient basis, and, if it
didn't, Scotts would owe AgrEvo 50% of the value of any shortfall. Scotts' "take or pay"
obligation to AgrEvo was thus $12.6 million; and if Scotts did not purchase any GA, it would
owe AgrEvo $6.3 million.

During the APA negotiations between Scotts and Farnam, it was agreed that Farnam
would take on responsibility for 50,000 pounds, or $2 million, of the 315,000 pounds/$12.6
million obligation that Scotts owed to AgrEvo. Both parties understood that this "take or pay"
obligation of Farnam was going to be calculated the same way as Scotts' "take or pay" obligation
to AgrEvo, namely at $40 a pound on a 100% active ingredient basis. Farnam only purchased
$963,127.25 worth of GA, which left a shortfall of $1,036,873. Therefore, Scotts argues that
Farnam's obligation under this provision of the APA is $518,436 plus interest.

On June 19, 2006, Plaintiffs initiated this action. The Complaint was later amended on
May 18, 2007 and asserts claims of breach of contract with respect to the purchase price; breach
of contract with respect to the obligation of good faith to meet sale projections; breach of
contract of the "take or pay" provision; and unjust enrichment. Defendant Farnam has denied any
liability and counterclaimed for breach of the representations and warranties in the APA and
breach of the implied covenant of good faith and fair dealing.

## II.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2]  The Court disregards all evidence favorable to the moving party that the

---

[2]  *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party.  *In re Morris*, 260 F.3d

jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not

sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon

---

654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

Plaintiff Scotts moves for summary judgment on Counts One and Three of its First Amended Complaint and on Counts One and Two of Defendant's Counterclaim. Defendant Farnam seeks summary judgment on the breach of warranty and breach of implied covenant of good faith claims and Scotts' claim for an additional $200,000. The Court will address each of the claims in turn.

### A. Scotts' Claim that Farnam Breached the Purchase Price Provision of the APA (Count One of the Complaint)

Scotts seeks an additional $200,000 from Farnam in connection with the sale of Finale. Scotts asserts that Farnam owes them $100,000 due to its involvement in the sale and distribution of GA products for the 12 months preceding September 30, 2005, and an additional $100,000 due to its involvement in the sale and distribution of GA products for the 12 months preceding September 30, 2006. Specifically, § 2.03(9) of the APA provides that Farnam was required to pay Scotts $850,000 in cash on or before September 30, 2005. After offsets claimed by Farnam, the amount Farnam still owed Scotts totaled $500,000. On February 13, 2006, Farnam paid Scotts $400,000 of the amount due and has made no further payments under the APA.

Farnam argues that it is not responsible for the additional $100,000 for the year after September 30, 2004 and subsequent years because it did not manufacture, market, distribute, or sell GA or any Finale product. In accordance with §2.03(10) of the APA, Farnam's payment to Scotts due on September 30, 2005:

> shall be reduced by $100,000 if [Farnam], together with its affiliates and successors, shall not have manufactured, marketed, distributed or sold any products containing

GA or any product utilizing the "FINALE" or "FINAL!" trademarks (or any derivative thereof) during the twelve months immediately preceding the date on which such payment would otherwise be due.

Scotts advances three arguments in support of its position it is owed the $200,000. Scotts first argues that Farnam was directly involved in the manufacturing, marketing, distribution, and selling of products containing GA in the 12 month preceding September 30, 2005 and the 12 months preceding September 30, 2006. Specifically, Scotts asserts that Shirlo, Farnam's master distributor of Finale, made Finale sales during the 12 month periods before September 30, 2005 and September 30, 2006. Kate Watkins, Vice President of Finance and Treasurer for Shirlo, testified that Shirlo sold 396 units of Finale for $1,960.00, during the 12 month period prior to September 30, 2005, and 300 units of Finale for $750.00, during the 12 month period prior to September 30, 2006. (Watkins Depo. at 37-39). Farnam argues that the total sales of $2,710 of Shirlo's leftover inventory are not considered sales by Farnam. By September 30, 2004, Shirlo had terminated its distribution rights to Finale and did not purchase any product from Farnam after that date. Farnam argues that the sales that were made were of product still on the shelves of a retailer and that such sales do not constitute sales by Farnam under the APA.

There is no dispute that Farnam's obligation to pay the additional $200,000 sought by Scotts is nonexistent if Farnam stopped manufacturing and selling products under the APA by September 30, 2004. The evidence adduced by Scotts in support of its argument that Farnam was still manufacturing and selling Finale products are the sales by Shirlo. It is undisputed that Farnam contracted with Shirlo to manufacture, market, sell, and distribute Finale products on Farnam's behalf. However, in March 2004, Shirlo gave notice that it would not continue to market or sell Finale products after September 30, 2004. (Harrison Aff. § 16, Ex. I). The notice was given

pursuant to Section 15(a) of the Shirlo Agreement which allowed Shirlo to discontinue further distribution of Finale and payment of associated license fees by giving notice of its intent to "permanently discontinue" use of the Finale trademark and the "manufacture, marketing, sale and distribution of any products containing [GA]." (Harrison Aff. Ex. H).

Scotts argues that the Shirlo Agreement "remained in effect from July 2002 through July 2007," citing to testimony from Kate Watkins of Shirlo. (Pl.'s Mot. for Summ. J. at 10). However, after careful review, that testimony by Ms. Watkins simply acknowledges that the Shirlo Agreement remained in effect as to products other than Finale for some time after September 30, 2004. The Court, however, is only concerned with the Finale products.

There is evidence that Shirlo made Finale sales during the 12 months periods before both September 30, 2005 and September 30, 2006, however, the sales were *de minimus*, totaling $2,710. Shirlo's Kate Watkins testified that these sales were liquidation of remaining inventory which Shirlo had purchased from Farnam in 2002. Shirlo did not pay, and Farnam did not receive any royalty or license payments associated with these post-September 2004 sales. Therefore, the Court finds that these sales do not amount to selling, marketing, manufacturing, or distributing of GA products by Farnam to trigger payment of the $200,000 under the APA.

Second, Scotts argues that Farnam is liable for the additional $200,000 because it maintained EPA registrations of Finale in California, Oregon, and Washington for 2005 and/or 2006. Scotts argues that Farnam's act of registry in these states triggers Farnam's obligation under the APA. Farnam asserts that it continued to maintain such registrations so that retailers could continue to legally sell their remaining Finale inventory that had been previously purchased from a distributor prior to September 30, 2004. However, Farnam posits, and the Court agrees, that maintaining such

-11-

registrations does not equate to post-September 2004 marketing or distribution of Finale products by Farnam.  Further, there is no evidence of post-September 2004 sales by Farnam associated with such registrations.

Finally, Scotts argues that Shirlo was a "successor" and "affiliate" of Farnam under § 2.03 of the APA, and therefore, Farnam must pay Scotts the $200,000 because its "affiliate and successors" manufactured, marketed, distributed or sold products containing GA between October 1, 2004 and September 30, 2006.  Farnam argues, and the Court agrees, that the Shirlo Agreement required Shirlo to protect the Finale trademark and share marketing plans with Farnam while the agreement remained in effect and Shirlo was acting as the exclusive distributor for Finale.  The Court does not find that any of the contract terms of the Shirlo Agreement referenced by Scotts transformed Shirlo into a "successsor" or "affiliate" of Farnam.  Further, as previously addressed, Shirlo terminated its marketing rights relating to Finale as of September 30, 2004.  There is no question that the terms of the APA, including the obligation of Farnam to pay $100,000 per year, was intended to last as long as Farnam continued to benefit from Finale sales.  The *de minimus* sales by Farnam do not justify an additional payment of $200,000 to Scotts.  Accordingly, Defendant Farnam is entitled to summary judgment on Plaintiff's claim for an additional $200,000 under the APA.

**B.      Scotts' Claim that Farnam Breached the "Take or Pay" Provision of the APA (Count Three of the Complaint)**

Scotts argues that under Section 7.10 of the APA, Farnam was required to purchase $2 million worth of GA on a 100% active ingredient basis, calculated by multiplying $40 a pound by 50,000 pounds by September 30, 2001, and if it did not, to pay Scotts 50% of any shortfall.  Scotts argues that the AgrEvo Supply Agreement between Scotts and AgrEvo was incorporated by

reference in Section 7.10 of the APA between Scotts and Farnam. Scotts argues that when reading

a contract that is incorporated by reference into another contract, the contracts must be read together.

*See Fouty v. Ohio Dept. of Youth Services*, 167 Ohio App. 3d 508, 528 (Ohio Ct. App. 2006)

(*quoting Christe v. GMS Mgt. Co., Inc.*, 124 Ohio App. 3d 84, 88, 705 N.E.2d 691 (Ohio Ct. App.

1997)) ("Where one instrument incorporates another by reference, both must be read together.

Courts should attempt to harmonize provisions and words so that every word is given effect.").

Scotts argues that even if Section 7.10 is ambiguous as to how Farnam's obligation is to be

calculated, the parol evidence in the record establishes that Farnam was required to purchase $2

million worth of GA on a 100% active ingredient basis, calculated by multiplying $40 a pound by

50,000 pounds.

Farnam argues that the express terms of the APA give Farnam the right, but not the

obligation, to purchase GA under the AgrEvo Supply Agreement. Farnam asserts that during

negotiations of the APA, it was adamant that it would not assume Scotts' take or pay liability.

Farnam states that it negotiated its own supply agreement with AgrEvo and agreed to pay $5.02 per

pound for a GA product called GA-20. This price equated to $27.90 per pound of pure GA.

Through September 30, 2001, Farnam asserts that it purchased more than $170,000 pounds of GA-20

and an additional 11,285 gallons of another Finale product. These purchases equated to 34,517

pounds of pure GA.

Section 7.10 of the APA specifically provides:

PURCHASER shall have the right, but not the obligation, to make purchases of
glufosinate ammonium ("GA") under the AGREVO SUPPLY AGREEMENT. Other
than the obligation to timely pay for any such purchases, PURCHASER shall have no
further obligations under the AGREVO SUPPLY AGREEMENT. In the event that

-13-

PURCHASER fails to purchase at least fifty thousand (50,000) pounds of GA (the "GA MINIMUM PURCHASE") by September 30, 2001, PURCHASER shall be obligated to pay SELLER an amount equal to 50% of the dollar value of the GA MINIMUM PURCHASE less the dollar value of the GA actually purchased; provided, however, that the parties hereto agree that the term "purchased" may include firm purchase orders received by AGREVO by September 30, 2001 for shipment at a later date if and to the extent that AGREVO recognizes such "purchases"' for purposes of SELLER's take-or-pay obligations under the AGREVO SUPPLY AGREEMENT. Furthermore, the parties acknowledge that PURCHASER may solicit and sell GA to other PERSONS in satisfaction of the GA MINIMUM PURCHASE provided that SELLER has given its prior written consent to such sales, which consent shall not be unreasonably delayed, conditioned or withheld and that such sales do not violate the terms of the AGREVO SUPPLY AGREEMENT. Except as set forth in this Section 7.10, SELLER shall retain all liabilities under the AGREVO SUPPLY AGREEMENT and PURCHASER shall have no liabilities thereunder.

There is no mention in the aforementioned section of the $40 per pound price. Scotts wants the Court to read the "dollar value" language to be $40 per pound. The basis for this argument is the $40 per pound figure that included in Scotts' contract with AgrEvo.

Where a contract is ambiguous, it is well-settled that extrinsic evidence may be considered to shed light on the parties' intent. *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). Such evidence may include any matter that legitimately relates to the contract terms at issue, including the factual context of the contract. *U.S. Fidelity & Guaranty Co. v. St. Elizabeth Medical Center*, 129 Ohio App.3d 45 (1998) (noting that extrinsic evidence may consist of (1) the circumstances surrounding the parties at the time the contract was made; (2) the objectives the parties intended to accomplish by entering into the contract; and (3) any acts by the parties that demonstrate the construction they gave to their agreement). When such extrinsic evidence is considered, contract issues can be resolved through summary judgment only if the contract language and evidence supports only one reasonable construction. *Gencorp Inc. v. American Int'l Underwriters*, 178 F.3d

804, 818 (6th Cir. 1999). If the extrinsic evidence relevant to the proper interpretation of contract language is contested or contradictory, summary judgment is generally inappropriate. *Id.* at 818-819.

Farnam asserts that "[w]hile Farnam recognized going into the APA transaction that it would have the right but not the obligation to purchase GA at the $40 per pound price set forth in the AgrEvo Supply Agreement, it always contemplated that it would negotiate a much lower price." (Def.'s Memo. in Opp. at 17). In fact, Farnam did negotiate and pay a price for GA that was far less than $40 per pound. Farnam purchased GA-20 at a price of $5.02 per pound. (Harrison Dep. Ex. 34). Farnam therefore argues that the "dollar value" of the GA products purchased by them was, at most, $5.02 for GA-20 and $27.90 for pure GA.

Scotts' argument—that Farnam was obligated to purchase $2 million worth of GA—is not supported by the plain language of Section 7.10. Instead, Scoots references the deposition testimony and affidavit of Richard Pontz. Though Richard Pontz references discussions in which it was noted that purchasing 50,000 pounds at $40 per pound would be $2 million, at no time does he state that this was the agreement between the parties. To the contrary, Pontz says that the plan would be to purchase GA at a price much less than $40 per pound. (Pontz Depo. at 91-92).

Farnam does admit, however, that APA Section 7.10 obligates it to pay an amount equal to fifty percent of the "dollar value" of the 50,000 pounds less the dollar value of the pounds of GA actually purchased. Farnam further concedes that it only purchased 34,517 pounds of GA, leaving a shortfall of 15,483 pounds. Applying the contract formula, Farnam is obligated to pay no more than fifty percent of the dollar value of this shortfall. Farnam states that its maximum potential obligation is $215,288 based on the dollar value reflected in Farnam's actual purchases.

The Court agrees with Farnam's contract interpretation and calculations. If the Court were to apply the terms suggested by Scotts, Scotts would receive a windfall. According to Scotts, Farnam's liability for GA not purchased would be more than twice as much as the price paid for its actual purchases. Farnam paid about $27.90 per pound for 34,517 pounds of GA at a total cost of $963,127. Applying Scotts' proposal, Farnam would be required to pay Scotts $66.96 per pound for each pound below the 50,000 pound minimum.[3] Essentially, Scotts' argument penalizes Farnam for negotiating a better per pound price from AgrEvo and transfers to Scotts the entire benefit of that negotiation. The Court, however, does not find any evidence that the terms of the APA were to be construed in this illogical manner.

The Court finds that Scotts is not entitled to the full $518,436 it seeks for breach of Section 7.10. Farnam is, however, liable to Scotts for some amount, assuming it has no viable affirmative defenses. Farnam has asserted the following affirmative defenses which will be examined in turn: (1) set-off; (2) statute of limitations; and (3) excuse of performance. Farnam bears the burden of proof on its affirmative defenses. *See Passa v. City of Columbus*, 2007 WL 3125130, at *6 (S.D. Ohio 2007).

With respect to the right to setoff, the Court finds that the right to setoff exists and will be properly calculated along with the damages after all the claims in this case have been adjudicated.

Farnam argues that Scotts' take or pay claim is barred by the statute of limitations. Farnam argues that any liability owed under Section 7.10 was not part of the purchase price for the Finale assets, but was part of an agreement to purchase goods and amounts to a liquidated damages

_____

[3] This calculation is based on dividing the shortfall of 15,482 pounds into the difference between the $2 million and the total amounts actually paid by Farnam.

provision. Contracts for the purchase and sale of goods are governed by the four year statute of limitations contained in the Ohio Commercial Code. O.R.C. § 1302.98. Farnam argues that any breach would have occurred by the fall of 2001, but Scotts did not initiate this action until 2006, and therefore, Scotts' claim is time-barred. Scotts, however, contends that the commercial code is not implicated because they were not a seller of GA to Farnam, and instead, the fifteen year statute of limitations for breach of contract applies. The Court agrees with Scotts.

Under the Ohio Commercial Code, "sale" means "the passing of title from the seller to the buyer for a price." O.R.C. § 1302.01(11). A "seller" is defined as "a person who sells or contracts to sell a good." O.R.C. § 1302.01(4). Ohio courts have instructed that when the contractual language and circumstances surrounding the formation of a contract establish that the primary purpose of a contract involves the sale of assets associated with a business, the four year statute of limitations does not apply. *See, e.g., Allgood Muni. Equip. Supply, Inc. v. Artino*, 1997 WL 625481, *6 (Ohio App. Ct. 1997).

In the instant case, the contractual language and circumstances surrounding the APA clearly establish that the primary purpose of the APA involved the sale of business assets. Further, the APA's "take or pay" provision did not obligate Scotts to sell to Farnam, and Farnam did not purchase GA from Scotts. Accordingly, the commercial code's four-year statute of limitations is not applicable to the "take or pay" provision of the APA and does not operate to bar Scotts' take or pay claim.

Finally, Farnam agues that any obligation to sell additional GA was excused by Scotts' own breach of its obligations under the APA. Farnam argues that Scotts represented that they had the right to transfer and assign any rights which Scotts possessed under the AgrEvo Supply Agreement.

Yet, AgreEvo did not believe that Scotts could transfer those rights without its consent and was unwilling to give it. (Harrison Depo. Ex. 32). Shortly after Farnam purchased the Finale assets, AgrEvo filed suit against Scotts, contending that its transaction with Farnam constituted an impermissible assignment of that agreement. The Court in the AgrEvo litigation concluded that the APA did constitute an assignment of rights that required AgrEvo's consent. *Aventis Environmental Sciences USA v. Scotts Company*, 383 F. Sup. 2d 488, 509 (S.D.N.Y. 2005). Farnam asserts that the uncertainty presented by this claim and by the associated litigation clearly impacted Farnam's ability to conduct the Finale business and to sell GA products. Scotts argues that this defense is waived because it was not raised in the answer. Further, Scotts argues that Farnam released this claim as part of the October 11, 2002 Limited Release. The Court agrees with Scotts.

As Scotts notes, Farnam failed to raise the excuse of performance defense in its answer to the Amended Complaint. Even if the Court were to conclude that Farnam has not waived this defense, however, the affirmative defense fails because Scotts has presented evidence demonstrating that Farnam was aware that it may need AgrEvo's approval for any transfer. (*See* Pontz Depo. at 37-38; Duff Depo. Ex. 2 and 3 (Mr. Pontz states to Mr. Duff that "AgrEvo must approve any transfer of their contract with Scotts . . . .")). Finally, no Farnam employee or representative was able to identify any damages incurred or lost sales resulting from any action taken by Scotts. (Duff Depo. at 49, 52-53; Harrison Depo. at 67-68, 72, 138-139, 156; Root Depo. at 46; Matera Depo. at 77; McLaughlin Depo. at 82, 92). Therefore, without any established harm, there cannot have been a material breach by Scotts that would excuse Farnam from having to fulfill its obligation under the APA's "take or pay" provision.

Having concluded that Farnam's affirmative defenses of excuse of performance and statute

of limitations are not applicable to Scotts' claim under the "take or pay" provision, Scotts is therefore entitled to summary judgment on that claim. The amount of damages will be determined at a later time after additional briefing and consideration of any applicable set-off.

## C.     Farnam's Counterclaims

Plaintiff Scotts argues that they are entitled to summary judgment on Defendant Farnam's counterclaims for breach of representation and warranty and breach of an implied covenant of good faith and fair dealing. Defendant Farnam also asserts that it is entitled to summary judgment on their counterclaims.

### 1.     Breach of Representation and Warranty

Farnam asserts that it is pursuing a claim for Scott's breach of the sales warranty as set forth in § 3.15 of the APA. In the APA, Scotts warranted that the Finale business would generate sales of at least $4,952,498 in 2000 and $5,101,021 in 2001. By the express terms of the agreement, failure to achieve these sales numbers in either year constituted a breach which entitled Farnam to recover $3.25 million in warranty damages. Farnam claims that Scotts failed to pay $3.25 million "when due," and Farnam claims that it is entitled to claim such damages as a set-off or recoupment against any and all amounts owed by Farnam under the APA. (Counterclaim ¶¶ 29-30).

Scotts does not dispute that Farnam's sales of the Finale products fell far short of the numbers warranted by Scotts. Instead, Scotts argues that Farnam already recovered on this claim when, in an October 18, 2001 letter, it elected to remedy this breach by taking a $3.25 million offset against future payment obligations that Farnam otherwise would have owed to Scotts under the purchase price provision.

Farnam concedes that it advised Scotts that it did not pay amounts owed under the APA so long as Scotts owed Farnam $3.25 million for breach of the sales warranties. Farnam argues, however, that this does not mean the claim for breach of the sales warranties simply vanishes as argued by Scotts.

Under Ohio law, the elements of a claim for breach of contract are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Doner v. Snapp*, 98 Ohio App.3d 597 (1994). There does not appear to be any dispute that Scotts breached the sales warranties of the APA. The dispute between the parties arises with respect to damages. Under the terms of the APA, Scotts owed Farnam $3.25 million for breach of the sales warranties. Farnam chose to take that amount as a offset to what it owed Scotts when Scotts did not immediately pay them. A party is entitled to claim offsets when another party owes a countervailing obligation that is then due. *See In re U.S. Aeroteam, Inc.*, 327 B.R. 852 (S.D. Ohio 2005). Farnam argues, and the Court agrees, that merely taking this right to set-off did not waive their right to warranty damages and interest. The Court therefore finds that summary judgment should be awarded to Farnam on its counterclaim for breach of the sales warranties. Farnam has been compensated for the breach of the sales warranties in the amount of $3.25 million taken as a set-off to the amount owed Scotts. Farnam is, however, entitled to prejudgment interest which will be calculated once all the claims between the parties are adjudicated.

**2.      Breach of an Implied Covenant of Good Faith and Fair Dealing**[4]

---

[4] In addition to being asserted by Defendant Farnam as a counterclaim, Plaintiff Scotts also asserts this claim in Count II of their Amended Complaint, Breach of Contract – Obligation of Good Faith to Meet Sale Projections. The Court will address both claims together.

Farnam argues that Scotts breached its implied covenant of good faith and fair dealing by "stuffing" the distribution channels with excessive inventory prior to Farnam's purchase and by engaging in litigation with AgrEvo. (Counterclaim ¶¶ 34-35). Scotts seeks summary judgment on Farnam's counterclaim, and Farnam seeks summary judgment on Scotts' second claim for relief, which alleges that Farnam breached an implied covenant of good faith when it did not achieve the sales figures that Scotts had warranted.

"The duty of good faith and fair dealing, implied in every contract, requires honesty and reasonableness in the enforcement of a contract." *O'Brien v. Ravenswood Apartments, Ltd.*, 169 Ohio App.3d 233 (Ohio App. 1st Dist. 2006); *see also Littlejohn v. Parrish*, 163 Ohio App.3d 456, 463 (Ohio Ct. App. 2005) (there is a duty of good faith implied in every contractual undertaking). In *Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433 (1996), the Ohio Supreme Court explained, "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." The implied covenant cannot be used to create new affirmative obligations in situations that were or could have been contemplated at the time of drafting. *Id.* Nor does the implied covenant impose new obligations as to matters specifically addressed by the terms of the contract. *Id.*

With respect to Farnam's counterclaim, Scotts argues that Farnam knew Scotts' distribution inventory levels prior to entering into the APA. Scotts references the extensive due diligence Mr. Pontz performed on Farnam's behalf prior to the execution of the APA, which included exchanging information with Finale distributors in order to ascertain the various inventory levels. (Pontz Depo. at 26-29).

-21-

Farnam argues that Scotts misconstrues its claim, asserting that this counterclaim is not a claim for damages, but rather a defense and affirmative claim to ensure that Scotts could not argue that the claim was not preserved. Farnam's arguments therefore be considered in conjunction with their claim for summary judgment on Plaintiffs' second claim, but not as an independent claim. Plaintiff Scotts is therefore entitled to summary judgment on Defendant Farnam's counterclaim.

Turning next to Scotts' second claim for relief for breach of the implied covenant of good faith and fair dealing, Farnam argues it is entitled to summary judgment because there is no legal support for such a reverse warranty obligation. Scotts is seeking to hold Farnam responsible for not achieving the sales figures that Scotts had warranted. Scotts argues that there is strong evidence that Farnam had a secret plan from the outset of the APA to avoid making sales at the levels warranted by Scotts in order to guarantee that Farnam would be entitled to take a $3.25 million set-off against its purchase price obligations. Scotts argues that there is a factual dispute with respect to this second claim, and therefore, summary judgment is not appropriate.

Farnam argues that an Ohio Appellate court recently rejected an argument analogous to the one made by Scotts. In *Board of Trustees v. Planned Development Co.*, 200 Ohio App. LEXIS 5780 (Ohio Ct. App. 2000), a contract for sale of a parcel of land included a provision giving the buyer a rebate of a portion of the sale price if the seller was able to sell a separate parcel to a third party. *Id* at *1-2. After the seller did not sell the other parcel, the buyer sued. The buyer alleged that the seller had breached the contract "by failing to make good faith efforts to complete the [separate sale] . . . ." *Id.* at *4. The court held that there was no implied duty of good faith and fair dealing with respect to the rebate clause: "Where a matter is specifically covered by the written terms of a contract, there are no implied promises in relation to that matter." *Id.* at *9-10. The court further stated that a

breach of the implied covenant could exist only if the seller did something to make real a possibility that the parties "did not contemplate at the time of the Contract's making." *Id.* at *11.

Similarly, in *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 695 (M.D. Pa. 2006), the court rejected an implied covenant claim under Ohio law, concluding that a network participation agreement did not include an implied obligation to make referrals or to provide prices and service information. The court stated that "there can be no implied covenants in a contract in relation to any matter that is not specifically covered by the written terms of the contract." *Id.* at 712. The court reasoned that the possibility of customer referrals was something that the parties could have contemplated when the contract was negotiated, and the plaintiff chose not to press for express obligations regarding referrals.

Based on the aforementioned case law, the Court rejects Scotts' breach of the implied covenant of good faith and fair dealing claim. The issues relating to Scotts' warranty obligations were contemplated and were a major component of contract negotiations between the parties. If Scotts desired for Farnam to accept minimum, prescribed marketing obligations, Scotts should have bargained for such provisions to be included in the APA. Defendant Farnam is therefore entitled to summary judgment on this claim.

# IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS in part and DENIES in part** Plaintiffs' Motion for Partial Summary Judgment (Doc. 41) and **GRANTS in part and DENIES in part** Defendant's Motion for Partial Summary Judgment (Doc. 44). As set forth above, Defendant Farnam is entitled to summary judgment on Counts 1 and 2 of Plaintiffs' Complaint; Plaintiffs are entitled to summary judgment on Count 3 of Plaintiffs' Complaint. Further, Defendant Farnam is entitled to summary judgment on its counterclaim for breach of the sales warranties, and Scotts is entitled to summary judgment on Farnam's counterclaim for breach of the implied covenant of good faith and fair dealing.

The only remaining issues in this case are Plaintiff Scotts' claim for unjust enrichment, damages and the right to set-off. Defendant Farnam shall file its brief on the unjust enrichment claim and its detailed damage calculations less any set-off, on or before November 10, 2009. Plaintiff Scotts shall file their response on or before December 10, 2009. Defendant's reply is due on or before December 24, 2009.

The Clerk shall remove Documents 41 and 44 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**