UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


**The Scotts Company LLC,** *et al.***,**

        **Plaintiffs,**

**-v-**                                    **Case No.:  2:06-cv-488**
                                             **JUDGE SMITH**
                                             **Magistrate Judge Deavers**

**Farnam Companies, Inc.,**

        **Defendant.**


## OPINION AND ORDER

This matter is before the Court on Defendant Farnam Companies, Inc.'s Motion for Partial Summary Judgment on Plaintiffs' remaining claim for unjust enrichment (Doc. 69) and Plaintiffs The Scotts Company LLC, Scotts Miracle-Gro Products, Inc., and OMS Investments, Inc.'s Motion to Reconsider (Doc. 72).  These Motions are fully briefed and now ripe for review.  For the reasons that follow, the Court **GRANTS** Defendant's Motion for Partial Summary Judgment and **DENIES** Plaintiffs' Motion to Reconsider.

## I.    BACKGROUND

This case, brought by The Scotts Company, LLC, Scotts Miracle-Gro Products, Inc., and OMS Investments, Inc. (collectively "Scotts") against Defendant Farnam Companies, Inc. ("Farnam"), arises from Scotts sale of assets to Farnam in February 1999.  Specifically, on February 15, 1999, Scotts and Farnam entered into an Asset Purchase Agreement ("APA") for

the sale of the Finale[1] business to Farnam. The relevant portions of the APA were included in this Court's September 14, 2009 Opinion and Order and some are repeated again here for purposes of discussion.

**A.      Section 2.03 of the APA ("The Purchase Price Provision")**

The purchase price provision of the APA, § 2.03, sets forth the timing and conditions in which Farnam will pay Scotts. This provision obligated Farnam to make the following payments:

1.    $1,573,852 at closing;

2.    $234,339 (representing 50% of the value of the excess Finale inventory) on or before May 15, 1999, subject to a right to set-off Farnam's direct costs associated with managing/reworking such inventory);

3.    $234,339 (representing the other 50% of the value of excess Finale inventory) on or before August 15, 1999, subject to a right to set-off Farnam's direct costs associated with managing/reworking such inventory);

4.    $48,449 (representing 100% of the value of excess raw material) on or before November 15, 2000, subject to a right to a set-off for the value of remaining raw materials still in Farnam's possession and not being used;

5.    $600,000 on or before October 31, 2001;

6.    $600,000 on or before September 30, 2002;

7.    $850,000 on or before September 30, 2003;

8.    $850,000 on or before September 30, 2004;

9.    $850,000 on or before September 30, 2005; and

10.   $100,000 on or before September 30th of each year thereafter through 2018, provided that such payments shall cease if and when Farnam or any

---

[1] Scotts acquired the Finale business from AgrEvo in the Spring of 1998. The Finale business consisted of the Finale line of non-selective herbicide ("NSH") products and the Vikor and Intercept brands of insecticide products. Finale was a weed killer and small competitor to RoundUp, the leading NSH brand in the industry.

> of its affiliates are no longer manufacturing, marketing, distributing or
> selling GA products or products utilizing the Finale trademark or any
> derivative thereof.

(APA at p. 12).

Additionally, the payment obligations set forth in the aforementioned sections 6 through 9 were to be reduced by $100,000 if Farnam (and its successors or affiliates) did not manufacture, market, distribute or sell GA products or products utilizing the Finale trademark or any derivative thereof during the 12 months prior to the date such payment is due.

After closing, Farnam took a number of set-offs in 1999 and 2000 against its future purchase price obligations under §§ 2.03(2), (3), and (4).  In October 2001, Farnam also took the position that it was entitled to a $3.25 million set-off pursuant to § 3.15 of the APA.  Farnam used this $3.25 million set-off to reduce their future purchase price payments under §§ 2.03(5)-(10).

In a December 11, 2001 email from Farnam's legal department manager, Pam Root, she explained that even if Farnam receives the full benefit of the $3.25 million set-off due to an alleged breach by Scotts of the Asset Purchase Agreement, "the next payment due to Scotts would be $500,000 on September 30, 2005."  (Root Dep. Ex. 4).  Rather than making the $500,000 payment, Farnam only paid Scotts $400,000.

Farnam took the position that it had ceased selling, marketing, manufacturing, or distributing GA products as of September 30, 2004 and therefore, it did not owe the additional $100,000.  However, Scotts asserts that Farnam was involved in the selling, marketing, manufacturing and distribution of GA products after September 30, 2004.  Farnam registered Finale products in one or more states.  Further, Farnam entered into a master distributor

arrangement with Shirlo for the distribution of Finale products and Shirlo continued to sell, market, manufacture and distribute GA products for two years after the September 30, 2004 time frame.  (Watkins Dep. at 37-39; Ex. 5).

**B.     Section 3.15 of the APA**

In § 3.15 of the APA, Scotts guaranteed that Farnam would achieve certain sales levels on the business lines it acquired from Scotts for the 12 months ending September 30, 2000 (the "2000 season") and for the 12 months ending September 30, 2001 (the "2001 season").  The sales level warranty was $4,952,448 for the 2000 season and $5,101,021 for the 2001 season.  In the event these sales levels were not achieved by Farnam, Farnam was entitled to a claim against Scotts for $3,250,000.  On October 18, 2001, Farnam informed Scotts that it did not hit these sales levels for either the 2000 season or the 2001 season.  Farnam sold about $2,176,000 of products associated with the Finale business for the 2000 season and $2,500,000 for the 2001 season.  It was at this same time that Farnam informed Scotts that it elected to take the $3.25 million set-off.  Scotts did not contest Farnam's claim of breach and did not challenge any of the offsets taken by Farnam.

By 2002, Farnam found the Finale business to be a failure and by mid-2002, transferred the rights to distribute and sell Finale to a third party, Shirlo, Inc., which continued to market Finale through September 30, 2004.  During the time Shirlo was responsible for Finale marketing, it sold less than $2,150,000 in Finale products.  In 2004, Shirlo gave notice to Farnam that it was terminating its arrangement to distribute and sell Finale products effective September 30, 2004.  After that date, Farnam did not sell any Finale products or products which used the active ingredients contained therein.

-4-

On June 19, 2006, Plaintiffs initiated this action.  The Complaint was later amended on May 18, 2007, to include claims of breach of contract with respect to the purchase price; breach of contract with respect to the obligation of good faith to meet sale projections; breach of contract of the "take or pay" provision; and unjust enrichment.  Defendant Farnam denied any liability and counterclaimed for breach of the representations and warranties in the APA and breach of the implied covenant of good faith and fair dealing.  Both parties moved for partial summary judgment and this Court issued an Opinion and Order on September 14, 2009, granting in part and denying part the respective motions.  The Opinion and Order also directed Defendant to address the proper application of offset principles to the liabilities adjudicated by that Order. Defendant Farman now moves for partial summary judgment on Plaintiffs Scotts' remaining claim for unjust enrichment and Plaintiffs, in their response, ask this Court to reconsider its September 14, 2009 Opinion and Order.

## II.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2]  The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.*  Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice.  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

---

[2] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.   DISCUSSION

Defendant Farnam moves for summary judgment on Plaintiffs Scotts remaining claim for unjust enrichment. Plaintiffs, in addition to their response, have also asked this Court to reconsider its September 14, 2009 Opinion and Order in this case (Doc. 68). The Court will first address the unjust enrichment claim and then the motion to reconsider. Finally, the Court will address the damage calculations as discussed in the previous Opinion and Order.

### A.   Unjust Enrichment

Plaintiffs allege that Defendant Farnam has been unjustly enriched by taking various set-

-7-

offs, credits and offset to which they were not entitled arising from the prior asset purchase.[3] Defendant Farnam argues that Plaintiffs' claim of unjust enrichment is preempted by the written Asset Purchase Agreement between the parties and must be dismissed. Plaintiffs, however, argue that there is an exception to the preemption principle cited by Defendant when there are allegations of bad faith.

It is well-settled that when the parties have a detailed, written contract, such as the APA in this case, the contract preempts any claim for unjust enrichment. *See Saraf v. Maronda Homes, Inc.*, 2002 Ohio App. LEXIS 6528 (Ohio Ct. App. 2002); *In re Estate of Popov*, 2003 Ohio App. LEXIS 4047 (Ohio Ct. App. 2003); *Wolfer Ent., Inc. v. Overbrook Dev. Corp.*, 132 Ohio App.3d 353, 357 (Ohio Ct. App. 1999) (explaining that unjust enrichment claims are barred when a party seeks a remedy under a contract because the terms of the agreement define the parties' relationship). Therefore, to the extent that the contract addresses the subject matter of the dispute, unjust enrichment is not available as a remedy. *Id.* Courts have held that if there is no remedy available in contract or tort, then the equitable remedy in unjust enrichment may be available. *See Banks v. Nationwide Mutual Fire Insurance*, 2000 Ohio App. LEXIS 5504 (Ohio Ct. App. 2000).

Scotts, however, argues that the unjust enrichment claim arises because Farnam acted in bad faith "by intending from the outset of the APA negotiations never to hit the sales warranty figures and deliberately failing to do so." (Pls.'s Response at 4). Scotts relies on *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989), in arguing the preemption

---

[3] Plaintiffs clarify in their Response that the unjust enrichment claim is only based on "the wrongful offset Farnam took related to the $3.25 million sales warranty claim." (Pls.'s Response at 19).

principle does not apply where there are allegations of bad faith.  Specifically, the Ohio Supreme Court stated in *Aultman*, "In the absence of fraud, illegality or bad faith, the hospitals are entitled to compensation only in accordance with the terms of the written agreement."  *Id.*

Scotts argues that there are no provisions of the APA that deal with Scotts' remedies in the event that Farnam conspires to suppress sales in order to make a claim under the sales warranty provision.  The provisions of the APA deal only with Farnam's remedies if the sales figures are not met.  Scotts cites as an example: "if the APA stated that Scotts would get $2 million in the event that Farnam fails to promote the Finale product line in good faith, then Scotts could not claim unjust enrichment because any such damages must be dealt with through a breach of contract claim."  (Pls.' Response at 21-22).

Farnam, however, argues that the detailed hundred-page APA includes express provisions dealing with payments, warranties, offsets and other rights and obligations.  Farnam continues, that even if Scotts was legally permitted to pursue such a claim, there is no factual basis for an unjust enrichment claim.  Farnam argues "To the extent that Scotts intended its unjust enrichment claim to be based on the availability of offsets arising from Scotts' breach of the guaranteed sales warranty, that issue has already been adjudicated in Farnam's favor in this Court's September 14, 2009, Order."  (Def.'s Mot. at 9).

The Court does not find that there is any conflicting law cited by the parties.  In fact, the parties agree that unjust enrichment claims are barred when a party seeks a remedy under a contract, if the contract addresses the subject matter of the dispute.  The issue before the Court is whether the APA addresses the subject matter of the dispute; or even if the subject is covered by the APA, whether Plaintiffs can prove Farnam acted in bad faith.

The Court has previously held that Scotts breached the sales warranties of the APA.  (*See* Doc. 68).  Farnam's sales of Finale products were much less than the sales warranted by Scotts.[4] Under the terms of the APA, Scotts owed Farnam $3.25 million for breach of the sales warranties.  Farnam chose to take that amount as a offset to the purchase price it owed Scotts. To reach the resolution sought by Scotts, the Court would have to find that Defendant Farnam acted in bad faith.

Scotts argues that "the record is riddled with evidence that, *when Farnam signed the APA to acquire the Finale business*, Farnam intended to suppress Finale sales to avoid hitting specified sales targets and thereby trigger the APA provision that gave Farnam a $3.25 million reduction in the sale price."  (Pl.'s Memo. in Opp. at 22) (emphasis in original).  However, these allegations essentially make up Scotts' breach of good faith and fair dealing claim, which the Court has already decided.  The Court previously held that "the issues relating to Scotts' warranty obligations were contemplated and were a major component of contract negotiations between the parties."  (September 14, 2009 Opinion and Order, Doc. 68, at p. 23).

Further, the warranty term was included at Scotts request in order to increase the purchase price.  It is reasonable to assume that the parties would have considered that Farnam might not achieve the warranted sales levels.  If Scotts intended for Farnam to meet minimum marketing obligations dealing with Farnam's efforts to achieve those sales goals, Scotts could have negotiated such provisions to be included in the APA.

---

[4]    The parties do not dispute that Farnam's sales of the Finale products fell far short of the numbers warranted by Scotts.  Farnam's Finale sales for 2000 amounted to less than $2.2 million and sales in 2001 were $2,558,649.90.

Despite Scotts' bold arguments that Farnam acted in bad faith, and with the specific intent to restrain Finale sales, there is insufficient evidence to support such assertions. Further, Plaintiffs Scotts' claim for unjust enrichment is governed by the APA. Accordingly, absent a finding of bad faith and a determination that the APA governs the subject matter of the dispute, Scotts' unjust enrichment claim is barred. Farnam is therefore entitled to summary judgment on the unjust enrichment claim.

**B.      Scotts' Request for Reconsideration of their Good Faith and Fair Dealing Claim**

Plaintiffs Scotts requests this Court reconsider its award of summary judgment to Defendant Farnam on Plaintiffs' good faith and fair dealing claim in light of the decision in *Galmish v. Cicchini*, 90 Ohio St.3d 22 (2000).

A motion for reconsideration pursuant to Rule 59(e) is designed only to "correct manifest errors of law or fact or to present newly discovered evidence." *Phelps v. Hamilton,* 122 F.3d 1309, 1324 (10th Cir. 1997); *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir. 1985), *cert denied,* 476 U.S. 1171 (1986). As such, a Rule 59(e) motion may be made for only one of three reasons: (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. *See Berridge v. Heiser,* 993 F.Supp. 1126, 1146-47 (S.D. Ohio 1998) (citing *Firestone v. Firestone,* 316 U.S. App. D. C. 152 (D.C. Cir. 1996)).

A motion for reconsideration is not a vehicle to reargue the case or to present evidence which should have been raised in connection with an earlier motion. *See Database America v. Bellsouth Advertising & Publishing,* 825 F. Supp. 1216, 1219-20 (D.N.J. 1993); 11 Charles Alan

-11-

Wright, Arthur Miller and Mary Kay Kane, *Federal Practice and Procedure,* § 2810.1 (2d ed.1995) (Motions to alter or amend judgment cannot be used to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment."). "[A] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." *In re Christie,* 222 B.R. 64, 66 (Bankr. D.N.J. 1998) (citing *Database,* 825 F.Supp. at 1220). "A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" *Database,* 825 F.Supp. at 1220.

Scotts argues that this Court should reconsider its prior ruling based on an Ohio Supreme Court case, *Galmish v. Cicchini,* 90 Ohio St.3d 22 (2000). However, this is not new law and was in fact briefed by the parties, and considered by this Court when considering the previous summary judgment motions. Scotts asserts that "The Court's Opinion did not address *Galmish,* but instead cited other decisions that did not involve a party entering into an agreement with the intent to frustrate the occurrence of a condition within that party's control." (Pls.' Memo. in Opp. at 23). The issue in *Galmish* was the parol evidence rule, which is not present in this case at all. Scotts even urges this Court to look at one of its prior cases in which the *Galmish* ruling was relied on, *Kreamer Sports v. Rocky Brands*, 2007 U.S. Dist. LEXIS 28094 (S.D. Ohio 2007) (J. Smith). However, *Kreamer Sports*, like *Galmish*, involved a parol evidence rule issue.

In *Galmish*, the plaintiff, Galmish, acquired property (land and an office building) pursuant to a divorce settlement with her ex-husband, Cicchini. 90 Ohio St. 3d at 23. Cicchini told Galmish that he could sell the property to developers for $1,700,000. *Id.* at 24. Galmish and

Cicchini made an agreement where Cicchini would purchase the property from Galmish for $765,000. *Id.* at 23. If the property was sold within one year of the agreement, Cicchini would pay Galmish one-half of the proceeds in excess of $765,000. *Id.* Galmish argued that from the time the contract was signed, Cicchini intended to delay the sale until one year after the agreement, thereby depriving Galmish of her share of the excess proceeds. *Id.* The court held that the parol evidence rule did not keep Galmish from introducing extrinsic evidence, because the evidence was not offered to change the terms of the contract. Rather, the evidence was introduced to show that the agreement was fraudulently induced. *Id.*

Scotts argues that *Galmish* controls the case at bar because Farnam, like the defendant in *Galmish*, harbored an intent not to perform at the time it executed the contract. Further, Scotts argues that the *Board of Trustees v. Planned Development Co.*, 200 Ohio App. LEXIS 5780 (Ohio Ct. App. 2000) and *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Sup. 695 (M.D. Pa. 2006), cases relied upon by this Court in the September 14, 2009 Opinion and Order are distinguishable because "both cases featured an express contract provision that permitted or contemplated the conduct constituting the alleged breach." (Pls.' Memo. in Opp. at 26).

The Court, however, does not find that there is a sufficient basis to support Plaintiffs' Motion for Reconsideration. Nothing in *Galmish* has changed settled Ohio law that the implied covenant cannot be used to create after-the-fact obligations that the parties could have or should have included in the contract. Plaintiffs maintain that they are not seeking to add, contradict or vary terms of the APA, but rather their claim is based on the promise implied in the writing that Defendant Farnam would not do anything to prevent hitting the sales targets. Again, Scotts is

-13-

attempting to transform its own warranty obligation in the APA into a Farnam liability.  However, there is no legal basis for this type of reverse warranty theory.  Further, Scotts has not provided any evidence to prove that Farnam took any action that caused it to fail to meet the sales warranty.  Accordingly, there has been no change in controlling law, no newly available evidence, nor any manifest injustice to the Plaintiffs to justify a reconsideration of this Court's prior ruling on Plaintiffs' breach of the implied covenant of good faith and fair dealing claim.  Therefore, Plaintiffs' Motion for Reconsideration is denied.

**C.  Damages**

The Court, in its September 14, 2009 Opinion and Order (Doc. 68), requested the parties provide detailed damage calculations less any set-off based on the Court's decision.  This Court held that Scotts is liable for breach of warranty, which has been specified as $3.25 million.  Farnam is liable to Scotts for $215,288 under the "take or pay" provision of the APA.  Farnam is also liable to Scotts for scheduled purchase price installments beginning on October 31, 2001 and continuing through September 30, 2005.  Though Defendant asserts that determining the damages is a "purely mathematical exercise," (Def.'s Mot. at 13), there are some issues that must be resolved prior to awarding damages.  There is a dispute between the parties regarding prejudgment interest.  Scotts is now arguing that Farnam is not entitled to prejudgment interest, or if it is awarded, that the Court should reconsider its prior determination of liability under the take-or-pay provision of the APA.  The Court will first consider the prejudgment interest issue and then make a final determination as to damages.

*1.    Prejudgment Interest*

Generally, a party is entitled to prejudgment interest on a contract claim from the time of

the breach.  *See Royal Electric Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110 (1995)

(where the amount becomes owed by reason of a breach of contract, interest begins to run at the

time the cause of action accrued).  By statute, prejudgment interest "acts as compensation and

serves ultimately to make the aggrieved party whole."  *See* O.R.C. §1343.03.  Prejudgment

interest is owed "when money becomes due and payable."  *Id.*

      A party's entitlement to prejudgment interest does not depend on whether the claim is

liquidated or unliquidated or whether it is capable of ascertainment prior to a determination by the

court.  *Royal Elec.*, 73 Ohio St.3d at 115.  In computing the amount of interest owed, the court is

to determine when the claim becomes due and payable and what legal rate of interest should

apply.  *Id.*  "To make the aggrieved party whole, the party should be compensated for the lapse of

time between accrual of the claim and judgment."  *Id.* at 117.  Where two parties have claims

against one another, the respective claims are to be set-off against each other as soon as the

respective obligations arose.  *Shinaberry v. Kirshner*, 1995 Ohio App. LEXIS 47 (Ohio Ct. App.

1995).

      Scotts argues that Farnam has been fully compensated in this case and that no money ever

became "due and payable" on the sales warranty claim.  Essentially, Scotts maintains that the

$3.25 million in warranty liability related only to future purchase price installments that were

never made.  Scotts is correct in that this is not the typical breach of contract claim case where

payment may be immediately due and payable upon a breach.  Rather, there was an agreement

between the parties that the sales warranty claim was to be satisfied as an offset against the future

purchase price payments.  Scotts asserts that "This unique arrangement served the purpose of

allowing the purchase price to be higher–as Scotts wanted–while also providing protection to

Farnam that it would not have to pay this higher price if the sales levels were not realized."
(Pls.'s Memo. in Opp. at 9).

Farnam, however, argues that Scotts contention that it "suffered no actual losses is absurd."  (Def.'s Reply at 5).  Farnam paid $1,573,852 in cash at or near the time of closing. Farnam also suffered actual out-of-pocket losses from operations in the range of $1.5 million during the warranty years because the promised sales did not materialize.  Farnam therefore claims that it suffered substantial out-of-pocket losses in addition to the unpaid purchase price installments.  Farnam asserts that its claim, with respect to the sales warranty, accrued and was due when it discovered the deficient performance after the first warranty year which ended on September 30, 2000.  *See Bales v. Isaac*, 2004 Ohio App. LEXIS 4254 (Ohio Ct. App. 2004); *Adams v. Primax Window Co., Inc.*, 1999 Ohio App. LEXIS 3640 (Ohio Ct. App. 1999) (where a warranty extends to future performance, a cause of action for breach of warranty is deemed to accrue when the breach is or should have been discovered).  Regardless of the total losses for breach of the sales warranty, the $3.25 million is Farnam's exclusive remedy for all past and future losses associated with that breach or any other breach addressed by Section 10.04 of the APA.

Therefore, the issue before the Court with respect to prejudgment interest is whether the $3.25 million was ever due and payable, and if so, when.  It is undisputed that Farnam never made a claim for the $3.25 million when the sales warranties were not met.  However, Farnam does assert that it gave Scotts notice of their breach of the warranty in October 2001, when they first explained that they would be applying a set-off with respect to remaining purchase price payments.  Nor did Farnam assert a claim for prejudgment interest before Farnam resolved its

-16-

purchase price obligation by taking a $3.25 million set-off against monies owed to Scotts.

The APA provides in detail that Scotts warrants the performance of the Finale product, but it does not include a time when payment is due in the event of the breach of the warranty. Scotts argues that the conduct of the parties should be used to determine the date on which payments were "due and payable" when the writing does not explicitly answer the question.

Scotts relies on *Holt v. DeVillers*, 2003 Ohio App. LEXIS 4656 (Ohio Ct. App. 2003), which they argue held that where a contract or agreement does not include the date upon which a sum is "due and payable," a court can and should look to the conduct of the parties to determine that date.[5] Regardless of the final outcome of *Holt*, the reasoning is sound as there are other courts that have looked to the conduct of the parties when a contract is ambiguous. *See Harry W. Applegate, Inc. v. Stature Elec., Inc.*, 275 F.3d 486 (6th Cir. 2001); *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993); *see also Hance v. Allstate, Inc.*, 2009 Ohio App. LEXIS 2393 (Ohio Ct. App. 2009) (court has discretion under R.C. 1343.03(A) to determine when money becomes "due and payable").

The Court agrees with Farnam that at the conclusion of the first warranty period, September 30, 2000, Farnam had suffered a significant loss. However, that loss did not even total the full $3.25 million it claims it is entitled to on that date.[6] It is more practical that the $3.25 million in damages that is provided for in the APA, would be due and payable after the end of the

---

[5] Scotts notes that the *Holt* court sua sponte vacated its own opinion because the appellant filed a voluntary notice of dismissal on the same day the opinion was issued. But, Scotts argues that since it was vacated for procedural reasons, the analysis is still applicable.

[6] Farnam has provided evidence that it suffered losses of $785,000 in the first warranty year. (Harrison Aff. at ¶10).

full warranty period (two years), September 30, 2001.  The evidence and the conduct of the

parties supports a finding that they intended the claim to be satisfied by way of an offset against

the future purchase price payments.  The Court finds that the parties did not intend for the entire

$3.25 million to be due as a lump sum on September 30, 2000.  Rather, the claim for the $3.25

million was triggered on October 1, 2001, when the sales number were not met at the completion

of the warranty period.  This is further evidenced by the fact that Farnam notified Scotts on

October 18, 2001, that the warranty amounts were not met and that it would be applying those

amounts as set-off.

      The Court also agrees with Scotts that Farnam was fully compensated in accordance with

the APA after the entire $3.25 million set-off was applied to the purchase price payments.  The

Court has acknowledged Farnam's argument–that it is claiming it suffered a much greater loss and

therefore has not been fully compensated–however, under the APA, Farnam's recovery on the

breach of the warranty is limited to $3.25 million.  Therefore, once Farnam took the full amount

of the $3.25 million as set-off against the purchase price owed, it became fully compensated.

Accordingly, Farnam is not entitled to prejudgment interest beyond that point.  Farnam is entitled

to prejudgment interest on the balance of the $3.25 million minus the offsets beginning October 1,

2001 through October 1, 2005.

      The Court will therefore apply well-settled law and "set-off the parties' debts to each

other as of the first date that each party is indebted to the other."  *McLin v. Leigh*, 74 Ohio

App.3d 127, 136 (Ohio Ct. App. 1991).  Further, the calculations will reflect the differing rates of

prejudgment interest for the applicable years.

Scotts also argues that Farnam is not entitled to prejudgment interest because such award would not be advancing the policy goals of Ohio Revised Code §1343.03(A). However, there are other purposes of prejudgment interest, such as compensating a party for delay in obtaining payment. Accordingly, prejudgment interest accrues when the claim accrues and in this case, the Court has determined that to be October 1, 2001 on the warranty claim.

Finally, Scotts argues that Farnam's claim for prejudgment interest must be denied because the underlying claim was satisfied before Farnam filed its request for prejudgment interest. Scotts states that, as a matter of law, when the underlying claim is satisfied before the claimant demands prejudgment interest, satisfaction of the claim extinguishes any right to prejudgment interest. *See Robert W. Setterlin & Sons v. North Market Dev. Auth.*, 1999 Ohio App. LEXIS 6468 (Ohio Ct. App. 1999). This case, however simply dealt with an issue of mootness. The *Setterlin* court held that satisfaction of a judgment renders any appeal moot, and did state that courts may consider requests for prejudgment interest "filed before satisfaction of judgment." *Id.* Though Scotts argues that the offsets taken by Farnam constitute satisfaction of Scotts' warranty obligation, Scotts has not accounted for the time period from when the claim came due until it was satisfied. It is during this time period that Farnam is entitled to prejudgment interest.

2.    *Damage Calculations*

The following chart sets forth in detail the aforementioned findings of this Court with respect to the damages awarded to each party and the calculation of prejudgment interest. The Court appreciates the chart prepared by Farnam and uses it as a basis for this chart, but has excluded any award of prejudgment interest prior to October 1, 2001. The calculations are based

on the principal amounts owed to each party and prejudgment interest calculated at 9% for 2001,

7% for 2002, 6% for 2003, 4% for 2004, 5% for 2005, 6% for 2006, 8% for 2007, 8% for 2008,

5% for 2009, and 4% for 2010.  The net result of the calculations is that Farnam is owed

$70,444.49.  This result is based on the prejudgment interest due to Farnam through September

30, 2005, which totaled $352,483.75, less the prejudgment interest due to Scotts accruing from

September 30, 2005, through the date of this judgment (September 8, 2010), less the $215,288

remaining on the payment owed to Scotts.

| Relevant Time Period | Amount Owed to Farnam | Amount Owed to Scotts | Prejudgment Interest to Farnam | Prejudgment Interest to Scotts |
|---|---|---|---|---|
| 10/1/01 to 10/31/01 | $3,250,000 | $215,288 | $22,760.34 | |
| 11/1/01 to 9/30/02 | $2,434,712 | $600,000 | $164,343.05 | |
| 10/1/02 to 9/30/03 | $1,834,712 | $600,000 | $114,669.50 | |
| 10/1/03 to 9/30/04 | $984,712 | $850,000 | $44,312.04 | |
| 10/1/04 to 9/30/05 | $134,712 | $850,000 | $6,398.82 | |
| 10/1/05 to 12/31/05 | | $215,288 ($750,000 - $400,000 pd - $134,712 offset) | | $2,691.10 |
| 1/1/06 to 12/31/06 | | | | $12,917.28 |
| 1/1/07 to 12/31/07 | | | | $17,223.04 |
| 1/1/08 to 12/31/08 | | | | $17,223.04 |
| 1/1/09 to 12/31/09 | | | | $10,764.40 |
| 1/1/10 to 9/8/10 | | | | $5,932.40 |
| **BALANCE** | | **$215,288** | **$352,483.75** | **$66,751.26** |

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant Farnam's Motion for Summary Judgment on Plaintiffs' unjust enrichment claim and **DENIES** Plaintiffs' Motion to Reconsider this Court's September 14, 2009 Opinion and Order with respect to their breach of the implied covenant of good faith and fair dealing claim.

As set forth above, Scotts is hereby ordered to pay Farnam a total of $70,444.49, for damages for the breach of warranty claim and prejudgment interest, less the purchase price payments and the amount owed on the take or pay provision and prejudgment interest.  Scotts shall submit this payment to Farnam no later than November 8, 2010, unless an alternative payment schedule is arranged between the parties.

The Clerk shall remove Document 69 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

 */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**